# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAMBRIDGE CONSULTING
GROUP, INC.

    Plaintiff,

VS.

BANK OF AMERICA, NA,

    Defendant.

CASE NO.
3:11-CV-00306-O

## ORAL DEPOSITION OF

## NATHAN CAMP

September 20, 2011
10:06 a.m.

48 East Avenue
Austin, Texas

Reported By:
Janalyn Reeves, CSR, in and for the State of Texas



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas TX 75201
www.esquiresolutions.com

### Page 1

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
                      AUSTIN DIVISION
CAMBRIDGE CONSULTING    )
GROUP, INC.             )
      Plaintiff,        )
                        )  CASE NO.
VS.                     )  3:11-CV-00306-O
                        )
BANK OF AMERICA, NA,    )
      Defendant.        )
                        )
```

*****************************************************
                  ORAL DEPOSITION OF
                      NATHAN CAMP
                  SEPTEMBER 20, 2011
*****************************************************

ORAL DEPOSITION OF NATHAN CAMP, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on September 20, 2011, from 10:06 a.m. to 1:45 p.m., before Janalyn Reeves, CSR, in and for the State of Texas, reported by machine shorthand, at the law offices of Broadus Spivey, 48 East Avenue, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

### Page 2

APPEARANCES

FOR THE DEFENDANT:
 Mr. Kyle Schindler
 FULBRIGHT & JAWORSKI L.L.P
 2200 Ross Avenue, Suite 2800
 Dallas, Texas 75201
 214-855-7458

FOR THE PLAINTIFF:
 Mr. Robert Goodman, Jr.
 KILGORE & KILGORE, P.L.L.C.
 3109 Carlisle Street
 Dallas, Texas 75204
 214-379-0823

### Page 3

INDEX
                                          Page
Appearances.................................. 2

EXAMINATION OF WITNESS

By Mr. Goodman................................ 4
By Mr. Schindler............................ 100
By Mr. Goodman.............................. 124
By Mr. Schindler............................ 142
By Mr. Goodman.............................. 143

Witness' Signature Page..................... 145
Reporter's Certificate...................... 147

EXHIBITS
No.   Description
72   Cambridge Consulting E-mail Search........... 9
57   E-mail from Jane Ford....................... 19
58   E-mail from Jane Ford....................... 19
61   E-mail to Mr. Sudderth...................... 20
62   E-mail to Mr. Camp.......................... 20
63   E-mail about HVAC........................... 21
64   E-mail to John Worrell...................... 25
65   Document commented on by Arcadis............ 25
66   Part of Web Page............................ 36
67   Document about mold toxicity................ 37
68   Lab Report From Breaker J, April 24th....... 39
69   Mold Inspection Report...................... 43
70   Lab Report.................................. 49
71   Mold Assessment Reports..................... 53
43   Asbestos At One Main Place.................. 65
45   E-mail to David Sudderth, John Worrell, and  66
     Jane........................................
55   Certificate of Completion................... 70
47   Spread Sheet................................ 73
48   E-mail From to John Worrell, David, and     83
     Todd........................................
73   Document.................................... 96
71   Photograph of Employee in Dallas at one of  126
     the HVAC Units..............................

### Page 4

NATHAN CAMP,
having being first duly sworn, testified as follows:
EXAMINATION
BY MR. GOODMAN:
Q. Mr. Camp, could you state your full name?
A. Nathan Camp.
Q. And your residence address and phone number?
A. My permanent address is 1637 Lonesome, Canyon Lake, 78133.
Q. And your phone number in case we need to reach you?
A. 512-744-5691. That's my cell.
Q. How are you employed today?
A. I'm the director of operations at Mold Inspection Sciences and also a shareholder.
Q. That's Mold Inspection Sciences of Texas, Inc.; right?
A. There's no "of" in there. Mold Inspections Sciences Texas, Inc.
Q. Do I understand that company, or an affiliate, does business outside Texas as well?
A. That's right. Yeah. An affiliate. Separate corporation.



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

App. 27

### 13

1  A. If I was told, I don't recall exactly. I know
2  there was a lot of wranglings going on between attorneys
3  and things like that, but I don't know who paid.
4  Q. You attended a mediation of their dispute, did
5  you not?
6  A. I attended some mediation. Again, I mean, I
7  remember, you know, there was a roofer and Don Putnam
8  and some other people there, yeah. I mean, I did see
9  some --
10 Q. You saw representatives --
11 A. -- some of that wrangling.
12 Q. Representatives of the bank and representatives
13 the landlord were there; correct?
14 A. Yeah.
15 Q. Neither of the Worrells were there, were they?
16 A. Like I said, I don't remember ever meeting them
17 and, I can't picture them in the room so I don't think
18 so, huh-uh.
19 Q. Okay. I'm going to switch gears for a second
20 just so I can get past it. Did you have any involvement
21 in the One Main Place project that occurred after the
22 Austin project was initiated?
23 A. Yes.
24 Q. What was your involvement as opposed to that of
25 Ms. Alcantara and Mr. Moussavian?

### 14

1  A. Again, I'm the director of operations, so --
2  Q. Was it a coordinating role or did you end up
3  having a substantive analytical role?
4  A. No. It was more of a coordinating role, but, I
5  mean, I would say I'm definitely the overseer of all.
6  Q. Okay.
7  A. Not that I want to be. Especially with that
8  stack of questions you have there.
9  Q. What is -- how old are you today.
10 A. How old among I? 43.
11 Q. How long have you been in the environmental
12 field?
13 A. Six years.
14 Q. And before that, generally speaking, what were
15 you in?
16 A. Sales. I mean, I've owned several businesses but
17 sales mainly.
18 Q. Do you have formal educational background in the
19 environmental area?
20 A. No.
21 Q. Have you taken courses or training since turning
22 to that business six years ago?
23 A. Yeah, a few.
24 Q. Okay.
25 A. None in the asbestos field.

### 15

1  Q. Do you have -- do you have the license from the
2  Texas Department of Health -- that may be the old name,
3  but do you have the environmental consultant or asbestos
4  consultant?
5  A. Not asbestos. I have no asbestos license. Mold
6  assessment consultant license.
7  Q. That single license relating to mold?
8  A. That's right.
9  Q. MISTex was engaged -- when in relation to the
10 time MISTex was engaged on the Austin project was it
11 engaged on the One Main Place project in Dallas, do you
12 recall?
13 A. When --
14 Q. When in relation to the time you first started
15 working on the Austin project, did you first start
16 working on the Dallas project?
17 A. I couldn't give you those dates. You surely have
18 that better than me. I mean, it seems like maybe
19 sometime late in the year 2009 we might have started at
20 One Main Place. I'm not sure.
21 Q. Did you have occasion to communicate with either
22 John Worrell or David Worrell about conclusions that
23 MISTex was reaching, in Austin and with respect to One
24 Main Place, the substance of reports and findings and
25 recommendations?

### 16

1  A. Did we talk about those things?
2  Q. Talk about them or e-mail about them?
3  A. I'm sure.
4  Q. Okay. Did you -- may I assume correctly that
5  MISTex never, and in hindsight, understated or
6  exaggerated the mold or asbestos conditions of either
7  building?
8  A. Understated or exaggerated? I would say we never
9  understate just because we are we probably follow the
10 line harder than most.
11 Q. Harder than most of your competitors?
12 A. Yeah. Just because there's a lot of liability
13 out there so we really pay attention to that, but, I
14 mean, overstating -- I'm going to just say that we would
15 be more conservative than most, so I'm not going to say
16 that we overstated, but I'm going to say that we
17 followed the --
18 Q. You're more conservative about your conclusions.
19 A. That's right.
20 Q. When you say "than your competitors," presumably
21 you have competitors in the State of Texas?
22 A. Sure.
23 Q. Who are the top three?
24 A. I really don't even know who the top three are.
25 Q. The top one?



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

App. 28

## 17

1  A. Yeah, you can't even really -- because, like, you
2  could say one in Austin, but there's different ones in
3  Dallas, different ones all over. So, I mean, we're in
4  all of the major cities. I don't know.
5  Q. You just know from practice you make more
6  conservative assessments than other people may have
7  obtained before or after you?
8  A. I just know that from remediation and abatement
9  contractors they seem to think that we are hard. We're
10  harder on them than other consultants. We make them
11  follow the rules.
12  Q. Do you remember either the -- well, let me -- of
13  either of the Worrells communicating with you in such as
14  way to suggest that you either understate or exaggerate
15  any particular environmental issue?
16  A. I don't remember any specific request or anything
17  like that. If anybody would have made a request or
18  anything like that, I would have told them what they can
19  do with it.
20  Q. Same question as to the bank, Mr. Ratliff or
21  Mr. Sudderth?
22  A. No.
23  Q. These are not -- you were not a party to these,
24  but Jane was a party to these e-mails. Can you take a
25  look at those two documents -- the first the cover

## 18

1  e-mail and the second document that was attached to
2  it -- and tell me if you have ever seen it before?
3      MR. SCHINDLER: Bob, can I ask you a
4  question before we get going into this? I understand
5  that he's here as corporate representative; is that
6  correct? Because we can ask -- you've been asking him
7  questions in his personal capacity and that might affect
8  whether or not there's any foundation or knowledge
9  regarding documents that are coming from MISTex.
10      MR. GOODMAN: When I'm saying "you," I mean,
11  I'll try to be -- I'll try to be more disciplined about
12  using the term "MISTex" than "you," but he is the head
13  of MISTex and so my questions really are intended to be
14  addressed to MISTex.
15      MR. SCHINDLER: As long as all three of us
16  are working under that understanding, I'm fine with
17  that. I just want the make sure that's clear. Okay?
18      MR. GOODMAN: I'll try to use "MISTex"
19  instead of "you," but I may fall into the "you."
20      MR. SCHINDLER: Thank you.
21  Q. (BY MR. GOODMAN) Did you see that before?
22  A. I mean, I don't know if I've read this. I mean,
23  I have no idea.
24  Q. Let me ask you a better way: Did Jane Alcantara
25  e-mail about the substance of what was going on at One

## 19

1  Main Place to you during the time she was working on
2  that project?
3  A. Well, I mean, I think the company would have CC'd
4  on almost everything. I mean I'm not sure -- I'm
5  actually surprised there's not somebody CC'd on this
6  e-mail, you know. I'm just surprised. Very rarely do
7  we send out individual e-mails like that.
8  Q. That was from --
9  A. It was still sent from one of the Worrell
10  brothers or whoever to Jane.
11  Q. And then she replied back.
12  A. And then she replied back.
13  Q. In other words --
14  A. What about this document? What do you want know
15  about this?
16  Q. Let me ask you this: In other words, frequently
17  you were copied on an e-mail relating to One Main Place
18  in addition to the Austin project, or you were an
19  addressee of it, or you addressed it with Jane?
20  A. Correct.
21      MR. GOODMAN: Those were Exhibits 57 and 58;
22  I should have said so.
23      (Exhibit Nos. 57 and 58 were marked)
24  Q. (BY MR. GOODMAN) Do you remember addressing the
25  issue in connection with One Main Place in June of 2010

## 20

1  that maintenance on the HVAC units should cease because
2  of the potential for physical disturbance of asbestos
3  within the units?
4  A. I remember some of those conversations, something
5  about maintenance of the units.
6  Q. Let me have you look at Exhibits 61 and 62 and
7  ask you if that refreshes your recollection. I think
8  there's one to which you're a party, but I haven't
9  located it yet.
10      (Exhibit Nos. 61 and 62 were marked.)
11  A. Okay so the question is do I remember this? I
12  remember there were some maintenance questions, you
13  know, where we thought that, you know, that maintenance
14  could disturb the ACMs.
15  Q. Do you know if maintenance of the ACMs,
16  asbestos-containing materials, in fact, continued to
17  occur on the HVAC units at One Main Place after you
18  advised that it shouldn't continue?
19  A. You know, I don't know what the follow-up would
20  have been, you know. I don't know -- or the
21  confirmation. I mean, I don't know -- I don't know that
22  for sure.
23  Q. Did anybody from MISTex follow up the warning not
24  to continue to perform maintenance after the first week
25  of June 2010 to see whether it was --



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

App. 29

### 101

1. bank about their lease obligation.
2. Q. And the same with One Main Place? MIST doesn't
3. have any role with regard to the lease obligations
4. between landlord and tenant?
5. A. No. Haven't had those conversations.
6. Q. So MIST's role is purely to serve as an
7. environmental consultant?
8. A. Correct.
9. Q. Which means at first MIST was brought in to
10. assess whether there was any problems with the two
11. buildings?
12. A. Yeah. We were brought in as environmental
13. consultants.
14. Q. And then y'all did some sampling, and then you
15. developed a remediation or abatement plan for both of
16. the buildings?
17. A. For both, yes.
18. Q. But that's the extent of MIST's involvement with
19. both of these buildings?
20. A. Absolutely.
21. Q. Okay.
22. A. Again, we didn't even know why we were called to
23. the Breaker J building except just to do a mold
24. inspection. I mean, I didn't know -- I mean, John and
25. David just said they worked for the bank. I did know

### 102

1. they weren't even direct employees of the bank for weeks
2. or months into the project.
3. Q. So the Worrell brothers contacted you first on
4. behalf of the bank?
5. A. I'm pretty sure that's how it happened. I think
6. that was first call.
7. MR. GOODMAN: Objection. I'm sorry. I
8. didn't hear your answer.
9. A. I think that was the first call. It was from one
10. of the Worrell brothers.
11. Q. (BY MR. SCHINDLER) During the process you
12. interacted with both the Worrell brothers and direct
13. employees for the bank?
14. A. During that time?
15. Q. Yes.
16. A. Yeah. Yeah. Very soon after -- as soon as --
17. before we even did the first inspection, we got
18. agreements signed by the bank. We were working for the
19. bank.
20. Q. You had a direct agreement with the bank?
21. A. Yes.
22. Q. And you stated earlier that the bank was paying
23. for all your services?
24. A. Right.
25. Q. And you were submitted your invoices directly to

### 103

1. the bank?
2. A. Right. Cambridge or the Worrell brothers have
3. never paid us a time.
4. Q. Did either of the Worrell brothers ever object to
5. the fact that the bank was -- that you were -- that the
6. bank was paying you -- I'll start over. Did either of
7. the Worrell brothers ever object to fact that the bank
8. was paying you directly?
9. A. No. I mean not at all. I mean, the Worrell
10. brothers -- whoever was first, that I first talked to
11. about this project, you know, again, he didn't really
12. identify what his position was with the bank. I just
13. remember that distinctly, going, what is this deal? You
14. know. And it was odd because he said, "No. Don't
15. worry. The bank will pay you. The bank will pay you,"
16. you know.
17. Q. So they did -- neither of the Worrell brothers
18. had any objection those bank paying you directly?
19. A. Oh, no. That was initially established from the
20. very first.
21. Q. That was the plan from the get-go?
22. A. Absolutely.
23. Q. Did either of the Worrell brothers ever object to
24. you having discussions with bank employees such as Mr.
25. Ratliff and Mr. Sudderth?

### 104

1. A. No.
2. Q. Did they ever object to you having direct
3. discussions with Arcadis?
4. A. No, I don't think so.
5. Q. And you considered the bank your client?
6. A. Yeah. The bank was always our client, yeah.
7. Q. Now, this was touched on earlier, but I just like
8. to get a little more detail: First of all, would you
9. say that MIST is an ethical company?
10. A. Yes. Absolutely.
11. Q. In fact, you stated earlier that you considered
12. MIST to be, I guess, would it be fair to say over
13. cautious when it comes to environmental recommendations?
14. MR. GOODMAN: Objection. Asked and
15. answered.
16. A. Yes.
17. Q. (BY MR. SCHINDLER) And the employees that do
18. consulting for you, they all have licenses; correct?
19. A. Correct.
20. Q. And would any of your employees sign their name
21. to a report or a remediation or abatement plan that
22. wasn't in compliance with regulations or rules?
23. A. Not knowingly.
24. Q. And would anyone at MIST ever cover up a problem
25. at the request of the client?



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

### 105

1   A. No. Absolutely not.
2   Q. And would anyone at MIST ever take any action
3   that would put their own licenses at risk on behalf of
4   the client?
5   A. Absolutely not knowingly.
6   Q. And you each never reported the bank to OSHA or
7   Texas State Department of Health Services for anything
8   with regard to Breaker J or One Main Place, have you?
9   A. No.
10  Q. And you've never observed anything that would be
11  reportable to any regulatory agency?
12      MR. GOODMAN: Object. Lack of foundation.
13  A. No.
14  Q. (BY MR. SCHINDLER) Has the bank ever told MIST
15  to cover anything up?
16  A. No.
17  Q. Has the bank ever taken any action with regard to
18  Breaker J or One Main Place that MIST would consider
19  unethical?
20  A. No.
21  Q. Has the bank ever done or said anything that
22  caused you concern regarding Breaker J or One Main
23  Place?
24      MR. GOODMAN: Objection. Vague.
25  A. Concern?

### 106

1   Q. (BY MR. SCHINDLER) That caused you concern for
2   the health and welfare of their employees?
3   A. No.
4       MR. SCHINDLER: Objection. Asked and
5   answered.
6   Q. (BY MR. SCHINDLER) So it's safe to presume that
7   anything that MIST prepared on behalf of the bank would
8   be, in MIST's knowledge, accurate and truthful?
9   A. Yes.
10  Q. And that anything that MIST prepared or signed
11  off on behalf of the bank as far as a plan or scope of
12  remediation or abatement would be a plan or scope that
13  is in compliance with all rules and regulations?
14  A. Yes.
15  Q. And that is it fair to say that any oversight
16  that a MIST employee had over a contractor during an
17  abatement or remediation process would be in compliance
18  with all rules and regulations?
19  A. With as much control as we have, yes.
20  Q. Right. And Mr. Moussavian has been doing
21  oversight on the abatement process at One Main Place; is
22  that correct?
23  A. Correct.
24  Q. Do you place a lot of trust in Mr. Moussavian?
25  A. Absolutely.

### 107

1   Q. What is your basis of placing that trust in
2   Mr. Moussavian?
3   A. Experience, his reputation. He has a reputation
4   for, you know, being as aboveboard as possible. Just
5   extremely ethical. And, you know, just his work ethic
6   completely.
7   Q. Would you consider him a very detail oriented
8   person?
9   A. Extremely.
10  Q. And that's beneficial in an industry like that
11  that requires compliance with rules and regulations?
12  A. Essential.
13  Q. Okay. And MIST ultimately agreed upon a scope of
14  abatement for One Main Place; is that correct?
15  A. Yes.
16  Q. And, in fact, Mr. Moussavian was the person who
17  authored that scope?
18  A. Yes.
19  Q. And there was some disagreement with the
20  landlord's consultant, Sigma, over the extent of the
21  abatement; is that correct?
22  A. Yes.
23  Q. It required a fairly lengthy negotiation process?
24  A. Absolutely.
25  Q. Is that pretty common in this industry?

### 108

1   A. It is. I mean it's common with schools. It's
2   common with everyone. This industry is common.
3   Q. It's how business often gets done in the
4   environmental consulting industry?
5       MR. GOODMAN: Objection. Leading.
6   Q. (BY MR. SCHINDLER) Is it common that that's how
7   business is done in the environmental consulting
8   industry?
9   A. Yeah. I mean, it's just these projects -- you
10  know, we write specs and sometimes it's a year before
11  the job gets started.
12  Q. And eventually at One Main Place the -- it was
13  discussed earlier that the agreed upon scope of
14  abatement was what was considered a partial abatement;
15  is that correct?
16  A. It could be considered partial, sure.
17  Q. In the sense that not all of the ACMs in those
18  four --
19  A. Right. Not the entire building was gutted to
20  remove all ACMs.
21  Q. And you said that's a fairly common practice and
22  procedure in your industry as well; is that correct?
23  A. Extremely common, yes.
24  Q. And is it a fair characterization that in this
25  instance the primary concern was with abating what was



Toll Free: 800.852.9737
Facsimile: 214.954.4111

ESQUIRE
an Alexander Gallo Company

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

## 109

1  seen as the riskiest ACMs on the bank's floors?
2     A. Yeah, the essential -- you know, again, some of
3  the things that are being abated now or have been abated
4  weren't necessary. They could have even argued further.
5  But, you know, we felt that the ones that were critical
6  are the ones that we needed to make sure got abated, and
7  they're being done.
8     Q. And so it's now your testimony that you're even
9  abating above and beyond what MIST would consider
10 absolutely critical?
11        MR. GOODMAN: Objection. Leading.
12    A. Well, I mean, that's kind of what I just said. I
13 mean, basically, yes. You know, the curtain wall, the
14 mastic on the curtain walls, you know, is definitely not
15 friable even though somewhat -- some of it was damaged
16 but it's definitely not friable. It's very unlikely
17 that it would get that way.
18    Q. (BY MR. SCHINDLER) And so does that deal with
19 the actual type of material as opposed to its location?
20    A. Type of material on that is much as anything.
21 You know, just because a non friable material is
22 considered, you know, a much less of a risk anyway.
23 It's a gluelike -- it's a gluelike material so that
24 fiber is not going to be released very easily unless you
25 started sanding it.

## 110

1     Q. And the decision to abate the ACMs that are
2  closest to the HVAC units relates to the fact that those
3  are the -- that is the riskiest location to have ACMs in
4  those floors?
5     A. The potential for disturbance was the highest
6  there.
7     Q. And what is the potential for disturbance by
8  having ACM near the HVAC unit?
9     A. Vibrations, air flow, basically. Vibrations and
10 air flow.
11    Q. And you mentioned earlier that you recommended an
12 abatement of some additional materials that are not, in
13 fact, being abated that were above the ceiling; is that
14 correct?
15    A. Correct.
16    Q. And you made reference to the fact that because
17 there was a containment area already. Could you explain
18 what you were saying about that?
19    A. Yeah. There wasn't already a containment, but
20 during the HVAC abatement, there would be a containment
21 there, you know, along that entire exterior perimeter
22 wall where this curtain wall insulation was.
23       So our contention was that if you are going to
24 put up containment there, then you go ahead and remove
25 that stuff up there.

## 111

1     Q. So kill more than one bird with the same stone?
2     A. Exactly. Which is the same reason why the
3  curtain wall insulation behind the units -- we said,
4  "Well, you should go ahead and do that."
5        And they went ahead an agreed to that because
6  you've got remove the unit anyway. There was some of
7  that we showed was damaged, so we said, "Okay. Well,
8  we're going to be removing those units. It exposes all
9  that insulation, so let's go ahead and do it."
10    Q. So this recommendation for these additional ACMs,
11 is that an example of MIST being -- I don't remember
12 your exact words -- but being sort of a stricter
13 environmental consultant than some others in the
14 business?
15        MR. GOODMAN: Objection. Leading. Asked
16 and answered.
17    A. You know, I would say that we are, again,
18 conservative in our approach and thorough, you know. We
19 want to be thorough. And it makes the most sense
20 financially even for the landlord having to pay for it
21 because it's already being done at that time. So, you
22 know, it makes the most sense for everybody. But that
23 stuff literally could sit there for years and not need
24 to be abated.
25    Q. (BY MR. SCHINDLER) Okay. Now, I would like to

## 112

1  talk about Breaker J for just a little bit.
2  Specifically, the mediation that you attended. I know
3  that's been touched on already. Did you participate in
4  any conversations prior to the mediation regarding
5  strategy for the mediation?
6     A. It seems some meeting we, you know, talked before
7  the meeting. But I don't remember discussing any
8  particular strategy.
9     Q. Did you -- sorry. Go ahead.
10    A. I don't remember discussing any strategy.
11 Except, you know, I remember we talked about, you know,
12 letting the other contractors, you know, speak and, you
13 know, put out there what they were planning on doing or
14 what they had found or whatever, you know. Just
15 allowing that to happen, you know.
16    Q. And during this mediation did MIST have any role
17 beyond commenting on the environmental issues?
18    A. No.
19    Q. Because you didn't have any role in discussing --
20    A. The roof, like we talked about, the roof but that
21 was kind of environmental because the roof leaks were
22 causing our problems.
23    Q. Okay. And at the mediation did all of the
24 parties start out in the same room during the mediation
25 with the landlord's side and the bank's side?



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

### 113

1   A. Yeah. I think we were all there. I don't think
2   there was any side meetings or anything.
3   Q. And at that point, both sides had, I guess --
4   A. Their own representatives.
5   Q. Their own representatives. And both sides had
6   their own environmental consultants?
7   A. Yeah.
8   Q. And did you ever break out into a separate room
9   with Mr. Sudderth?
10   A. I don't think so.
11   Q. Okay. Do you ever remember Mr. Sudderth's
12   commenting that after the mediation that he thought that
13   the environmental issues had been overblown or words to
14   that effect?
15   A. I don't remember any specifics comments. I don't
16   remember that.
17   Q. Do you ever remember whether or not Mr. Sudderth
18   was upset in any sort of way during or after the
19   mediation?
20   A. I don't remember any emotions between -- from
21   anybody particularly.
22   Q. Okay. But it was clear to you during the
23   mediation that the landlord at the Breaker J building
24   was not going to let the bank out of their lease?
25   A. I mean, the landlord -- I just remember the

### 114

1   landlord trying to bring it back, you know, several
2   times. "Let's just get back to, you know, what we need
3   to" kind of thing. And it's just like, seemed to want
4   to -- the landlord's -- I think the landlord had counsel
5   there, too. I think there was an attorney there for the
6   landlord there. Is that true? Does anybody know?
7         MR. GOODMAN: If it would have been, his
8   name was Deech (phonetic).
9   A. Deech. Yeah. So the landlord had an attorney
10   there and I remember him going, "Oh, let's just calm
11   down. We are going to do what y'all want us to do.
12   We're going to fix this."
13         That's what they said.
14   Q. (BY MR. SCHINDLER) And ultimately they did fix
15   it?
16   A. Yeah. Everything that we found they fixed.
17   Q. And you oversaw the remediation of the mold by
18   the contractor?
19   A. We tested it in tandem with their -- like, their
20   consultant would call us and say, "We're ready," and we
21   would go at the same time.
22         So I would say we oversaw it in tandem with them.
23   Q. So both sides' consultants oversaw the --
24   A. Yeah. And our results, even -- one of the times
25   our results showed -- showed that it wasn't clear and

### 115

1   their results showed that it was clear, and we made them
2   retest it.
3   Q. When the remediation was finished, you were
4   satisfied with the results were clear at that point?
5   A. Yeah. I don't remember our final report. Y'all
6   would have that, but I think everything got done.
7   Q. And between the time when you began working for
8   the bank and the remediation began, no one occupied that
9   building; is that correct?
10   A. No. No occupants. Not that I know of.
11   Q. So to the extent that mold does pose a risk, no
12   one was being put at risk during that time period?
13   A. No. We never -- I think that one sample in that
14   triangle room was the only ambient air sample that we
15   ever got that was elevated, anyway.
16         But we just kept contending that there was a risk
17   there. So nobody -- I don't think anybody was ever at
18   risk.
19   Q. And now that it has been remediated, now the
20   building is in a good condition to be occupied again?
21   A. It should be fine. We tested it even after the
22   fact --
23   Q. Okay.
24   A. -- and everything came back good.
25   Q. Now, you stated earlier with regards to, I can't

### 116

1   remember which building, but that air quality was the
2   most important factor in determining risk to occupants
3   in buildings. Am I properly characterizing what you
4   said?
5   A. I mean, I would say something like that, so I'm
6   not sure what, you know, what we were talking about
7   specifically. But air quality would be most important.
8   Because before we were talking the mold and I was
9   talking about it doesn't matter what's really in that
10   wall; it matters whether or not that's in our air.
11   Q. And it's your belief that at One Main Place that
12   there wasn't any airborne asbestos?
13         MR. GOODMAN: Objection. Leading. Asked
14   and answered.
15   A. You know, again, when I was asked that question
16   about, you know, airborne asbestos, you know, I asked
17   Jane, Kourosh, everybody, you know, do you really think
18   that the air samples would show elevated levels? Nobody
19   really believed that we would get elevated levels. We
20   didn't believe that.
21   Q. (BY MR. SCHINDLER) Okay. And as a part of the
22   abatement process that's going on at One Main Place,
23   MIST does air testing both before and after each of the
24   floors are abated; is that correct?
25   A. Yeah. We take baseline samples before the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

## 121

1  purposes, sure.
2  Q. And so the landlord has the incentive to minimize
3  the problems that are in the building if the --
4  A. And costs.
5  Q. And the costs of the abatement; is that correct?
6  A. Yeah.
7  Q. Okay. But the tenant, on the other hand, has the
8  incentive to get as much abatement as possible from the
9  landlord.
10 A. They want everything to be perfect. That's --
11 why not?
12 Q. And the tenant does have been any even incentive
13 to minimize the potential health risk in its own
14 building when negotiating with the landlord.
15      MR. GOODMAN: Objection. Form.
16 Q. (BY MR. SCHINDLER) And you don't think that the
17 bank ever minimized the risk during this process at One
18 Main Place?
19      MR. GOODMAN: Objection. Leading.
20 A. I mean, we never felt that the bank was -- we
21 never felt that it was -- you know, something wasn't
22 being done that was critical. We never, you know, took
23 that position.
24      MR. GOODMAN: Objection. Lack of
25 responsiveness.

## 122

1  Q. (BY MR. SCHINDLER) And if something had been
2  going on that -- I'm sorry, you said that you never felt
3  that anything was being done that was critical; right?
4  A. Yeah. I mean, I never had that opinion. That
5  there was something critical that wasn't being done that
6  needed to be done.
7  Q. And if something critical was not being done, in
8  fact, MIST would have made sure that it got done; is
9  that correct?
10      MR. GOODMAN: Same objection.
11 A. We would have. We definitely would have put out
12 e-mails or, you know, notified people or done whatever
13 we needed to do. I mean, that's what we would have
14 done.
15 Q. (BY MR. SCHINDLER) One last set of questions:
16 You mentioned that at some point the Worrells were no
17 longer involved with discussions at One Main Place;
18 correct?
19 A. Right.
20 Q. Do you remember when that was, if you can?
21 A. I'm going to say that it was sometime at the very
22 beginning of January.
23 Q. Do you have any idea --
24 A. The only reason why I say that, just so you know
25 what I'm basing that on, is because I know we started

## 123

1  the project in January and I know that they were out of
2  the picture, you know, before that project started.
3  Q. And did you ever speak with the Worrells about
4  why they were no longer involved with the project?
5  A. No, I don't think they ever told me.
6  Q. Did anyone else ever talk to you about why the
7  Worrells were not involved in the project anymore?
8  A. No. I mean, we got a call from legal and they
9  just said that, you know, our confidentiality, you know,
10 was with the bank and that we were not to CC or, you
11 know, discuss bank relations -- bank job or whatever
12 with the Worrell brothers. And even at this time they
13 didn't say Cambridge Consulting, by the way.
14 Q. So then the final scope of abatement that was
15 ultimately agreed upon was signed and agreed upon after
16 the Worrell brothers were no longer in the picture?
17 A. Yeah. Yeah. Because there was -- we were still
18 negotiating even pretty much up to the last minute
19 because we were doing revisions on the scope for, you
20 know, for weeks.
21 Q. And the entire abatement process has taken place
22 after the Worrell brothers were no longer involved?
23 A. Right.
24      MR. SCHINDLER: Pass the witness.
25              EXAMINATION

## 124

1  BY MR. GOODMAN:
2  Q. Other than the conversation where the bank told
3  you not to communicate with the Worrells anymore, did
4  you ever have direct discussions with bank
5  representatives?
6  A. They didn't actually tell me not the communicate
7  with the Worrells, by the way. They actually said, "If
8  you have other dealings with the Worrell brothers that's
9  fine. But you're not to discuss bank stuff with them."
10     Just to clarify that.
11 Q. Did you ever -- other than that communication,
12 did you ever have any direct discussions with bank
13 representatives or Arcadis about the Worrells or
14 Cambridge?
15 A. Uh-huh.
16 Q. No?
17 A. No. Oh, no. I mean, I did have -- when I got
18 the subpoena I called --
19 Q. I'm talking about before the litigation?
20 A. No. No. No. When I got the subpoena, that's
21 all I can talk about.
22 Q. Did you -- do you have any reason to believe that
23 the bank was disappointed in your explanation of
24 environmental issues at the mediation?
25 A. No. I don't think so.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

### Page 141

```
 1    or the landlord. So it all came down to that, you know,
 2    "Well, we'll do this because you or going to do that.
 3    We'll do this because you or going to do that."
 4        Q. Were you aware that the bank gave notice of a
 5    default to the landlord in Dallas in connection with
 6    the -- in connection with the One Main Place lease?
 7        A. I don't know -- I don't remember or recall any
 8    default notice or anything like that.
 9        Q. Why, in your understanding based on MISTex being
10    involved in these projects, did the bank agree to
11    abatement and remediation rather than use the serious
12    environmental issues presented by the mold and asbestos
13    to reduce or remove their obligations on their leases?
14            MR. SCHINDLER: Objection. Calls for
15    speculation.
16        A. Yeah and I think I've answered this already. I
17    don't -- you know, I don't know for sure. And I wasn't
18    privy to One Main Place negotiations at all as far as
19    that goes, you know. I don't -- all I know is from, you
20    know, from John it seemed to me that, you know, the
21    landlord didn't want to give up the leases and that --
22        Q. (BY MR. GOODMAN) Did --
23        A. That was -- but again, you know, we did try the
24    stay out of that part of this job, you know. It wasn't
25    our job.
```

### Page 142

```
 1        Q. Did the bank wimp out? If you know.
 2        A. Yeah, I have no idea.
 3        Q. Okay.
 4            MR. GOODMAN: Nothing further.
 5            EXAMINATION
 6    BY MR. SCHINDLER:
 7        Q. Just a couple more questions and we'll let you
 8    out of here.
 9        A. All right.
10        Q. The bank and the landlord at One Main Place --
11    were they on the same side in this situation? In the
12    negotiation?
13        A. The bank and the landlord?
14        Q. Mr. Goodman was asking you whether or not the
15    tenant and the landlord ever end up on the same side of
16    not wanting to do it?
17        A. No they are never on the same side. They are
18    still not on the same side at all.
19        Q. And, in fact, the negotiations went down to the
20    very last minute before the scope was agreed upon?
21        A. We seem to be negotiating every day.
22            MR. GOODMAN: Objection.
23        A. It truly, you know, this is one of those things.
24    This has cost the bank a lot of money, too. I mean, the
25    bank is paying us to oversee the project where somebody
```

### Page 143

```
 1    else is already being paid. I mean the landlord is
 2    paying their own consultant, but they are paying us to
 3    oversee that consultant. We're talking hundreds of
 4    thousands of dollars.
 5        Q. (BY MR. SCHINDLER) Did safety win out in this
 6    case?
 7        A. I think -- yeah, I think safety won out, because
 8    if safety didn't win out, then who cares if the landlord
 9    is doing the right job? But I think bank is taking the
10    safest route by having us oversee their work. I mean,
11    you know, spending another 300 grand at least just to
12    have that done with the safe route.
13            MR. SCHINDLER: That's all I have. Thanks.
14            EXAMINATION
15    BY MR. GOODMAN:
16        Q. That's the approximate amount of your fees for
17    overseeing the abatement?
18        A. Yeah. That's obviously -- maybe I shouldn't even
19    have said that.
20        Q. I think we had some indication of it, but
21    that's --
22        A. It's approximately $250, but Arcadis -- we are
23    subcontracting under Arcadis. You probably know that
24    already, and, obviously, they're going take make a
25    percentage on top of our fees.
```

### Page 144

```
 1        Q. Okay.
 2            MR. GOODMAN: Thank you.
 3            (Deposition concluded.)
```



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Nathan Camp September 20, 2011

```
                    145
 1         CHANGES AND SIGNATURE
   NATHAN CAMP
 2 SEPTEMBER 20, 2011
 3 PAGE  LINE  CHANGE           REASON
 4  ____  ____  _____  _____
 5  ____  ____  _____  _____
 6  ____  ____  _____  _____
 7  ____  ____  _____  _____
 8  ____  ____  _____  _____
 9  ____  ____  _____  _____
10  ____  ____  _____  _____
11  ____  ____  _____  _____
12  ____  ____  _____  _____
13  ____  ____  _____  _____
14  ____  ____  _____  _____
15  ____  ____  _____  _____
16  ____  ____  _____  _____
17  ____  ____  _____  _____
18  ____  ____  _____  _____
19  ____  ____  _____  _____
20  ____  ____  _____  _____
21  ____  ____  _____  _____
22  ____  ____  _____  _____
23  ____  ____  _____  _____
24  ____  ____  _____  _____
25  ____  ____  _____  _____
```

```
                    146
 1  _____
 2  _____
 3  _____
 4  _____
 5  _____
 6  _____
        I, NATHAN CAMP, have read the foregoing
 7  deposition and hereby affix my signature that same is
    true and correct, except as noted above.
 8
 9       _____
                 NATHAN CAMP
10
11  THE STATE OF _____ )
    COUNTY OF  _____ )
12
13      Before me, _____, on this day
14  personally appeared NATHAN CAMP, known to me (or proved
15  to me under oath or through _____ )
16  (description of identity card or other document) to be
17  the person whose name is subscribed to the foregoing
18  instrument and acknowledged to me that they executed the
19  same for the purposes and consideration therein
20  expressed.
21      Given under my hand and seal of office this
22  _____ day of _____, 2011.
23
24       _____
             NOTARY PUBLIC IN AND FOR
25           THE STATE OF _____
```

```
                    147
 1       IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
 2                 AUSTIN DIVISION
 3  CAMBRIDGE CONSULTING  )
    GROUP, INC.           )
 4    Plaintiff,          )
                          ) CASE NO.
 5  VS.                   ) 3:11-CV-00306-O
                          )
 6  BANK OF AMERICA, NA,  )
      Defendant.          )
 7                        )
 8
 9           REPORTER'S CERTIFICATION
             DEPOSITION OF NATHAN CAMP
10             SEPTEMBER 20, 2011
11      I, JANALYN REEVES, a Certified Shorthand Reporter in
12  and for the State of Texas, do hereby certify to the
13  following:
14      That the witness, NATHAN CAMP, was duly sworn by me
15  and that this transcript of the oral deposition is a
16  true record of the proceedings held and the testimony
17  given by the witness;
18      That the original transcript, along with any exhibits
19  marked therein, was submitted on _____, 2011, to
20  _____ for examination and signature by
21  the witness;
22      That pursuant to information given to me at the time
23  said testimony was taken, the following includes counsel
24  for all parties of record:
        Mr. Kyle Schindler, Attorney for the Plaintiff
25  (31 minutes)
```

```
                    148
 1  Defendant (2 hours 57 minutes)
 2
 3      That $_____ is the deposition
 4  officer's charges to the Defendant for preparing the
 5  original deposition transcript and any copies of
 6  exhibits;
 7      I further certify that I am neither counsel for,
 8  related to, nor employed by any of the parties or
 9  attorneys in the action in which this proceeding was
10  taken, and further that I am not financially or
11  otherwise interested in the outcome of the action.
12      I further certify that before the completion of
13  the deposition, the Deponent and/or the
14  Plaintiff/Defendant did request to review the
15  transcript.
16      Certified to by me this _____ day of
17  _____, 2011.
18
19                  [signature]
20
        JANALYN REEVES, Texas CSR 3631
21      Expiration Date 12/31/2012
        3101 Bee Caves Road
22      Centre II, Suite 220
        Austin, Texas 78746
23      (512) 328-5557
        Firm Registration 283
24
    EBS No. 267710
25
```



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com